# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:09CR92** |
| **vs.** | ) | |
| | ) | **FINDINGS AND** |
| **MIGUEL GASTELO-ARMENTA,** | ) | **RECOMMENDATION** |
| | ) | |
| **Defendant.** | ) | |

This matter is before the court on the motion to suppress evidence (Doc. 23) filed by defendant, Miguel Gastelo-Armenta.  An evidentiary hearing was held on September 25, 2009 (Doc. 52, transcript) and December 16, 2009 (Doc. 58, transcript).  The motions were deemed submitted on December 24, 2009, upon the filing of the final volume of the hearing transcript.

On March 13, 2009, the defendant's vehicle was stopped by an Omaha police officer for having an obstructed license plate. In this motion, the defendant contends all physical evidence and statements obtained as the result of the traffic stop should be suppressed because the officer violated his Fourth Amendment rights.  Specifically, defendant alleges that the officer did not have probable cause to conduct the traffic stop or a reasonable suspicion to believe that the defendant was engaged in criminal activity; the traffic stop was unlawfully expanded into a drug interdiction investigation and he was detained longer than necessary for the officer to process a traffic infraction; the officer searched defendant's vehicle without consent, a warrant, or probable cause to believe there was contraband in the vehicle; and his statements should be suppressed as fruit of Fourth Amendment violations.

## I.  FACTUAL BACKGROUND

Officer Michael Bossman and DEA Special Agents Frank Feden and  Aaron Bowen testified on behalf of the United States.  An expert witness, Steven D. Nicely, testified for

the defense. Edward J. Van Buren was called as a rebuttal witness. Their testimony is summarized below.

### A. Special Agent Frank Fedon (Government's Witness; Filing 52)

Special Agent Fedon testified that on March 9, 2009, he was working on an investigation with the Lincoln Police Department. On that date, law enforcement used a confidential informant (CI) to purchase controlled substances in Lincoln. Fedon was part of the surveillance team assigned to follow the person who supplied the narcotics to the CI. He was stationed at the Waverly exit on Interstate 80 to follow the supplier's vehicle if it traveled east from Lincoln.

Fedon was advised that the drug delivery had actually occurred at about 2:30 p.m. He was told to watch for an unknown Hispanic male driving a black Grand Jeep Cherokee with Nebraska license plate PW0186. Fedon saw this vehicle pass the Waverly exit eastbound on Interstate 80. He and other officers followed the vehicle to an apartment complex near 44th and Davenport Streets in Omaha. At about 3:30 p.m., another male got into the vehicle, and the vehicle began traveling south on 44th Street. Fedon lost sight of the vehicle in the area of 42nd Street and westbound Interstate 80.

### B. Special Agent Aaron Bowen (Government's Witness; Filing 52)

Special Agent Bowen testified that he conducted surveillance in the area of 44th and Davenport on March 10, 2009. At about 8:45 a.m. he saw a black Grand Cherokee with Nebraska license plate PW0186 parked on the corner of 44th and Davenport. At 12:20 p.m., Bowen saw two Hispanic males exit the residence at 4401 Davenport, walk to the black Grand Cherokee, return to 4401 Davenport, go in and out of 4401 Davenport a couple times, return to the Grand Cherokee, enter the Grand Cherokee vehicle, and depart. Bowen followed the Grand Cherokee for a about 10 minutes, but lost it in a residential neighborhood.

Agent Bowen conducted surveillance at 4401 Davenport on March 13, 2009. His attention was focused on that address due to the events of March 9, 2009 and his prior surveillance on March 10. At about 9:30 a.m. on March 13, Bowen observed a red Cadillac DeVille with Nebraska license plate RCA241 parked at the corner of 44th and Davenport. At about noon, he saw two Hispanic males walk up Davenport Street and knock on a side door at 4401 Davenport. They did not enter the house. Bowen then watched the two men walk back to the west on Davenport to a Walgreens parking lot located at Davenport Street and Saddle Creek Road, less than one block from the house at 4401 Davenport. The two men entered a gray Lexus sedan with Oklahoma license plates 989DHE. A registration check was performed, and the registered owner of the Lexus vehicle was one Ricardo Ferandez. (#52, 19:6-11).

The two men drove the Lexus to a McDonald's on Dodge Street and left the McDonald's about 45 minutes later. Shortly thereafter, Agent Bowen discontinued surveillance of the Lexus vehicle, returned to 4401 Davenport, and continued to watch that location.

At about 4:00 p.m. on March 13, 2009, Bowen saw the red Cadillac DeVille arrive at 4401 Davenport. Two Hispanic males (defendant, Miguel Gastelo-Armenta, and Luiz Enrique Gonzalez) got out of the Cadillac and entered 4401 Davenport from the side door. They did not knock before entering. At 4:05 p.m., Bowen saw the gray Lexus return to 4401 Davenport. The two occupants of the Lexus (Juan Jose Resamora and Ricardo Aon Fernandez) knocked on the side door at 4401 Davenport and entered the residence.

At 4:40 p.m., Agent Bowen saw all four of the Hispanic males exit 4401 Davenport. The defendant and Luiz Enrique Gonzalez approached the Cadillac and the other two walked over to the Lexus. The defendant was carrying a green and black duffle bag, which he placed in the trunk of the Cadillac.

The Cadillac and the Lexus vehicles drove to the Walgreens parking lot, where the two individuals from the Lexus exited the Lexus and got into the Cadillac. They left the Lexus in the Walgreens parking lot. Agent Bowen and other officers, including Omaha Police Officer Mike Bossman, followed the Cadillac as it departed the Walgreens parking lot. The agents had informed Officer Bossman that they were following a vehicle they suspected to contain narcotics and asked if Bossman could find probable cause to stop the vehicle.

According to Agent Bowen, Officer Bossman conducted a traffic stop of the Cadillac and contraband was found in the Cadillac. The occupants were all placed under arrest. Agent Bowen and Omaha Police Officer Paul Milone obtained a search warrant (Exhibit 10) for the residence at 4401 Davenport.

### C. Omaha Police Officer Michael Bossman (Government's witness; Filing 52)

Michael Bossman testified that he has been an Omaha police officer for seven years, during which time he has worked in the uniform patrol bureau and the K-9 unit. He worked with a dual purpose service dog, Skeen, for three and one-half years, beginning in March 2006. Skeen was retired from service in the summer of 2009 because he has three arthritic vertebrae that prevent him from performing the physical functions demanded of a police service dog.

During his assignment to the K-9 unit, Bossman conducted over 1,400 traffic stops. As a K-9 officer, his responsibilities were to provide support for uniform patrol officers in searching for dangerous suspects in houses, buildings and outdoor areas, and to conduct criminal interdiction on Interstate 80.

Bossman's initial police training at the academy consisted of 22 weeks of classroom, followed by 15 weeks of field training. After graduating from the police academy, he attended training classes on the subjects of search warrants, searches and seizures, and

-4-

interdiction. To Bossman, the term "interdiction" meant catching criminals while they are mobile–transporting illegal narcotics, money, guns, or other criminal activity while they are on the road. His general training addressed the rules that apply to the display of vehicle license plates in Nebraska and window tinting on vehicles driven in Nebraska.

Bossman testified that he also attended Desert Snow training, which is a week-long interdiction class in Loughlin, Nevada. This class covered things to look for while conducting criminal interdiction such as signs of deception, hidden compartments, locating contraband in vehicles, and other signs of criminal activity.

Bossman worked with a Belgian Malinois service dog named Skeen during his three and one-half years as a K-9 officer. Skeen was a dual-purpose dog, meaning that he was trained to do both patrol work and drug detection work. Skeen had been trained and was partnered with another handler before being partnered with Bossman. Skeen did not require further training on how to recognize odors, but Bossman and Skeen did continuing training. Bossman and Skeen were initially trained in a 12-week session, which included some classroom and five days a week of hands-on training with the dog. The training included the topics of apprehension, tracking, evidence recovery and odor of narcotics. Bossman had to learn how to handle the dog properly, to look for the dog's indications, and to learn the dog's particular behavior. Bossman used the term "gift" to initiate a drug detection odor search with Skeen.

Skeen was trained to react to the odors of marijuana, methamphetamine, cocaine and heroin. Bossman testified that Skeen would "alert," i.e., change his behavior, when he detected the odor of illegal narcotics. Those behaviors vary with different dogs, and part of the training was focused on Bossman learning Skeen's particular behavior. A change of behavior could involve such things as the dog's ears perking up, intent sniffing, head jerking, and intense tail wagging.

An "indication" is the dog's trained behavior, exhibited when the dog has located the strongest source of the odor of illegal narcotics. Indication behavior varies from dog to dog. Skeen was trained to be an aggressive indicator, meaning that he would bite, bark or scratch at the strongest source of the odor. (#52, 38:18-39:1).

The training program in which Officer Bossman and Skeen participated was put on by the Omaha Police Department ("OPD") in accordance with the standards and policies of the OPD, which are the same as the standards and policies of the Nebraska State Patrol. (#52, 39:6-12). The 12-week training program included constant evaluations. The handlers and their dogs then went through the State of Nebraska's certification process, which included 14 different searches for hidden narcotics. During these searches, Skeen was commanded to search a particular area, and Bossman would watch Skeen's behavior for an alert and an indication. If and when Skeen gave an indication, Bossman would point that out and identify the location of the narcotics. Bossman and Skeen satisfactorily completed the certification testing. Bossman and Skeen were certified or recertified as a team on April 28, 2008. (*See* Exhibits 2 & 3). The certification was valid for one year.

Bossman testified that he and Skeen also participated in maintenance training, which was conducted periodically throughout each month, either individually or with other members of the K-9, or as a unit as a whole. The goal set out in the manual, is four hours of training per week, and eight hours of training as a unit once per month. The type of training required was not specified, and the handlers had discretion to determine what training was needed at the time, and when the training would occur.

The purpose of the maintenance training was to make sure that the dogs continued to be proficient and trained on the odor of narcotics. The dogs and handlers would perform narcotics detection and/or patrol exercises during maintenance training. Exhibit 4 includes the records of Skeen's training from January 2008 through April 2009. The forms were completed by Officer Bossman and signed by the commander of the K-9 unit; the presence

-6-

of the commander's signature did not mean that the commander was personally present at the training sessions.

Officer Bossman worked with Skeen for patrol work and for drug detection work, and he completed a Deployment Form whenever Skeen was actually deployed to locate the odor of narcotics. Exhibit 5 contains Skeen's deployment forms covering the time from January 2008 through March 13, 2009. There are no deployment forms for the time between September 25, 2008 and March 13, 2009 because Bossman received no calls for service by from uniform patrol, and he had no occasion to deploy Skeen on any criminal interdiction activity.

On or about March 13 of 2009, Officer Bossman was contacted by a DEA task force agent, who asked Bossman to be available as a uniformed officer in a marked police cruiser to assist with a traffic stop if the opportunity presented itself. Bossman understood that the agents were watching a vehicle, and if Bossman located that vehicle and identified a traffic violation, he could initiate a traffic stop and conduct an investigation. He was told to watch for a maroon Cadillac with tinted windows and received updated locations periodically from Matt Watson, a task force officer. Bossman observed the suspect vehicle himself when it was traveling westbound on Pacific Street and turned south onto 72nd Street. Bossman caught up to the Cadillac between Pacific Street and the Center Street overpass on 72nd Street. He noticed the Cadillac had a license plate bracket with a gold medallion that obstructed part of the State of Nebraska name on the license plate. (*See* Exhibit 8, photograph of front plate). He believed a traffic violation had occurred because a Nebraska state statute "says there cannot be any blurring matter, anything covering the letters, numbers, or anything on the plate that allows us not to be able to read the plate." (#52, 53:8-11).

Bossman also was able to see the Cadillac's rear and side windows when the Cadillac turned onto 72nd Street. (*See* Exhibits 6 & 7). The rear window was very dark, making it

almost impossible to see into the vehicle.  The side windows were also very dark.  Bossman believed a traffic violation had occurred because the darkness of the window tinting significantly impaired his ability to see into the vehicle, so much so that he was unable tell how many occupants were in the Cadillac.

The Cadillac turned west onto Grover Street from 72nd Street.  Bossman stopped the vehicle on Grover near 72nd Street at 5:20 p.m. by activating his overhead emergency lights and signaling for the vehicle to pull over. He noted that 72nd Street is a very busy thoroughfare, and it would have been dangerous to stop the Cadillac on 72nd Street.

Bossman's police cruiser was equipped with a video and audio recording device. Video recording begins when he activates the emergency overhead lights, and the video recorder captures 15 seconds prior to the activation of the lights. Audio recording begins when the emergency lights are activated.  Exhibit 1 is the recording of this incident.

Bossman approached the driver's side of the Cadillac.  He was not able to see through the rear window of the Cadillac well enough to determine how many people were in the car. He stopped at about the A-pillar to contact the driver.  The rear window started to come down at that point.  The driver's window was down, and Bossman could then see that there were four men in the vehicle: two in front and two in back.  He spoke to the driver through the open window.

Bossman first asked the driver if he spoke English. He said he did not.  A passenger in the back seat said he spoke English so, through the passenger, Bossman asked for identification and the paperwork for the vehicle.  The driver was identified as the defendant, Miguel Gastelo-Armenta.  Defendant was asked to produce his driver's license and/or identification, vehicle registration, and proof of insurance.  Defendant produced the registration, an insurance card and a Mexican ID card.  The insurance card was expired.  The name on the vehicle registration was a female name; it was not the name of the driver or the passenger to whom he was speaking.

-8-

At Bossman's request, the defendant got out of the Cadillac and was placed in the front seat of Bossman's cruiser.  Because Bossman did not speak Spanish and could not communicate with the defendant in English, he returned to the Cadillac and asked the passenger, Ricardo, to assist with translation.  Ricardo agreed, came back to the cruiser, and stood outside the front passenger window.  Bossman got back into the driver's seat of the cruiser and examined the documents.  He could not find a date of birth on the Mexican ID card and asked Ricardo to ask the defendant about his date of birth, address, and other biographical information.

During this conversation, Ricardo told Bossman that he was from California, the defendant was from Omaha, and the Cadillac belonged to the wife of a friend of the defendant's.  They did not know the woman's name and knew the owner's husband only by his first name, Carlos.

Bossman asked Ricardo where they were coming from.  He said they were coming from "a house" and were going to get something to eat.  When asked where, Ricardo and the defendant conversed for a little bit, and then said they were going for Chinese food.

After obtaining biographical information, Bossman initiated a data check through the radio to see if the defendant had a valid driver's license or outstanding wants or warrants. While the data check was in progress, Bossman conversed with Ricardo.  Ricardo said he came to Omaha by bus to visit some family and was going to be in Omaha for only two days. He intended to return to California by bus.  Ricardo said the other two occupants in the car were friends and lived in Omaha.

After every question Bossman asked, Ricardo's first response would be "Huh?" or "Hmm?" or "What?"  Bossman recalled asking Ricardo a question about the two friends in the car and whether they lived in Omaha and receiving a response something like, "Yeah – Well, yeah."  Bossman testified this response "wasn't consistent" and thought Ricardo was stalling for an answer he didn't know.  In his Desert Snow training, Bossman received

-9-

training concerning responses to questions and peculiarities that an officer should watch for in determining whether there may be criminal activity afoot. In particular, he was instructed that when people answer a question with a question or stall trying to answer the question, they do not know the answer to the question, and are trying to come up with an answer. Relying on this training, Bossman considered Ricardo's repeated responses of "Huh?" or "What?" to be significant. This pattern continued outside the context of the two friends in the Cadillac. Considering other signs of nervousness that he saw, Ricardo's responses indicated to Bossman that Ricardo was trying to tell Bossman what he wanted to hear, and did not know the answers to the questions.

The radio dispatcher reported that she could not find any record of the defendant, either in Nebraska or NCIC. Bossman then asked for a "triple I" check, that is, a 50-state check for the party's identification or criminal record.

Bossman told the defendant he intended to issue citations for the defendant's failure to produce a valid driver's license, but was not going to write a citation for the tinted windows or the license plate display violation.

During the traffic stop, Officer Bossman noticed that the defendant could not sit still and kept shifting back and forth. He wiped the palms of his on his thighs on several occasions and would not make eye contact. The defendant's right eyelid was twitching. He was breathing rapidly and heavily and yawned a couple times. He appeared to be extremely nervous. In general, a person's nervousness will subside when they learn they are only going to get a citation, a minor citation, or a warning or a verbal warning, or something to that effect. The defendant's level of nervousness did not subside, and he appeared to be much more nervous than the "normal innocent motoring public." (#52, 74:4-5). The continued level of nervousness suggested that the defendant could be involved in additional criminal activity.

-10-

While Bossman was writing the citation in the cruiser, Ricardo tried to direct the conversation towards Bossman's cruiser camera, as well as the mobile data computer in the cruiser. Bossman asked how long the defendant had been living in Omaha and learned, through Ricardo, that the defendant had been in Omaha for three months and previously lived in Mexico.

The dispatcher advised that the results of the triple I check were negative, meaning that the defendant could not be located through the triple I, or had no criminal record.

While seated in the cruiser, the defendant signed the citation, and Bossman returned the documents to him. The occupants of the Cadillac wanted to know how much the ticket was, how to pay the fine, where to go to pay the fine, and the proper procedure for handling it. Ricardo wanted to know if he could drive the vehicle, or who could drive the vehicle. In response, Bossman asked Ricardo for his identification. Ricardo produced a California driver's license which Bossman checked on the mobile data computer and determined to be valid.

Bossman and the defendant stepped out of the cruiser and joined Ricardo at the front of Bossman's cruiser. All of the defendant's papers had been returned. Ricardo and the defendant had no further questions. Approximately 22 minutes had elapsed since the inception of the traffic stop.

After returning the defendant's papers, Bossman asked the defendant and Ricardo if they had a second, and if he could ask them some more questions. The defendant nodded and shrugged his shoulders in the affirmative. Bossman then asked if they were transporting anything illegal in the Cadillac vehicle. He received a negative response that no, they were not. Bossman then asked if he could search their car. The initial response was that it was not their vehicle. Bossman replied that he understood it was not their vehicle; he was asking them for permission because they were in control of the vehicle. The defendant responded

no, they did not want Bossman to search the vehicle because it was not their vehicle. This conversation took about one minute.

Bossman then told the defendant he suspected there may be criminal activity involved with the Cadillac and its occupants, and he was going to use his narcotics detection K-9 to sniff the exterior of the vehicle. Bossman testified that the following factors had aroused his suspicions, based on his training and experience: drug smugglers typically use third-party vehicles to conduct illegal activities; the owner of the vehicle was not present; they did not know the name of the owner; the vehicle was under surveillance by the DEA; and the defendant was extremely nervous. Ricardo's stated travel plans, involving lengthy bus trips to and from California for a two-day visit with "family," did not seem plausible.

At Bossman's direction, defendant and Ricardo waited in the front sidewalk area of a nearby residence. Bossman opened each of the passenger-side doors of the Cadillac and directed the other two occupants to get out and join the defendant and Ricardo, which they did. They left both passenger side doors open. Bossman closed the rear passenger door, but did not close the front passenger door.

Bossman then retrieved Skeen from the cruiser and commanded Skeen to conduct a search. This search is recorded on Exhibit 1. Approximately one minute elapsed between the time Bossman announced his intention to have Skeen sniff the exterior of the vehicle and the time Skeen was deployed.

When conducting a canine sniff, Bossman's practice is to have all the occupants exit the vehicle. He then places the dog on the street, making sure there is nobody else around and no dangerous traffic conditions. Bossman then gives Skeen the command, "gift," to search for narcotics and directs Skeen around the vehicle. Bossman testified he was trained to direct the dog by placing his hands on the vehicle and directing the dog to follow his hand up or down or to put his nose at specific parts of the vehicle where air would escape. It was

-12-

necessary to keep Skeen on a leash during this deployment due to the presence of a backup officer, four civilians, and traffic.

In this case, they started on the driver's side near the trunk, proceeded to the rear passenger's side, down the passenger side, across the front, and back up the driver's side.

Bossman testified that he and Skeen made four circuits around the Cadillac. During the first pass, Skeen did not exhibit any alert-type behavior but did physically place his snout into the vehicle's interior through the open front passenger door.

At the beginning of the second pass, Skeen's head jerked back to a particular area right by the rear license plate of the vehicle, signifying that Skeen sensed an odor of illegal narcotics. Although this was "alert" behavior, it was not an "indication." During the second pass, Bossman instructed the dog to jump into the vehicle. Skeen jumped into the Cadillac through the open front door and remained inside the car for a couple seconds. Skeen stuck his head underneath the passenger side, suggesting that he was attempting to locate the stronger source of that odor.

On the third pass, Skeen once again alerted at the rear of the vehicle, pausing at the same spot where he had jerked his head on the second pass. Skeen paused there and took a big sniff, and they continued to circle the car. It appeared to Bossman that Skeen had detected the odor of narcotics and was searching for the strongest source of the odor. The front passenger door was still open, and Skeen again jumped into the car, remaining inside the car for about eight seconds. Bossman acknowledged on direct and cross-examination that he should have shut the car door and Skeen should not have been allowed inside the vehicle without permission. Skeen jumped into the back seat, rammed his nose into the area where the back of the seat and the seat cushion meet, and then came out. Bossman shut the car door, and they continued to circle the Cadillac.

At the end of the fourth pass, Skeen exhibited indication behavior by scratching on the taillight and back quarter panel area on the driver's side. Bossman then put Skeen back into the cruiser. The entire canine sniff search took approximately two minutes.

On cross-examination, Officer Bossman admitted that Skeen made one false indication during a re-certification exam conducted on May 12, 2009, as reflected on the grade sheet, Exhibit 101. The exhibit also shows, however, that the examiner found Skeen's overall scores (including his indication score) to be above average.

Bossman went back to the Cadillac to talk to the defendant and Ricardo, asking them if there was any reason his dog would think there were illegal narcotics in the vehicle. He tried to downplay the significance of the question, asking them if they had maybe smoked marijuana in the car. Initially, they responded that there would not be any reason. Later, they advised Bossman that the guy who gave them the car also smokes marijuana in the car.

Bossman told the defendant and Ricardo to sit back down and asked where the keys to the Cadillac were. They responded that the keys were still in the vehicle. Bossman retrieved the keys, opened the trunk and began to search the car because Skeen had indicated in that area. Bossman found a green duffle bag in the trunk, opened it, and found crystals, white powder, a scale, and some cellophane wrapping material. He believed the powder and crystals were controlled substances.

All four occupants of the Cadillac were placed under arrest. DEA agents came to the scene to assist. A large amount of cash was found on the defendant's person.

### D.  Steven D. Nicely (Defense Expert Witness; Filing 52)

Steven D. Nicely is the expert witness employed by the defendant. He has testified as an expert witness in this court on at least two other occasions (*see United States v. Prokupek*, 2009 WL 2634446, Case No. 8:08CR183 (D. Neb., Aug 14, 2009), and *United States v. Christy*, 2008 WL 753888, Case No. 8:07CR238 (D. Neb., Mar 19, 2008)). His

*curriculum vitae* ("CV") was admitted, without objection, as Exhibit 102; however, Nicely did testify as to several modifications which should have been made to the CV.

Mr. Nicely testified that he previously handled a K-9 for the military in the 1970s. He described that experience as "busy." (#52, 158:13-14). He "went through the military working dog school in 1974" and "did OJT before that." He "went through the supervisor's course" in 1975 or 1976, and when he "was in Okinawa [he] attended the Kadena school over there." In Okinawa, Nicely was "what they refer to now as the kennel master," at which time he had one dog and six or seven teams under him. At his last duty station, he was the kennel master and did all kinds of searches, such as vehicle searches, barrack searches, aircraft searches, and the like.

Apparently, during the time he was in the military, Nicely personally trained his own dogs to locate marijuana and, possibly, heroin and cocaine. He testified that he trained with customs officials, possibly near Lackland AFB, San Antonio, Texas. (*See* 159:3-13 & Exhibit 102 at p. 3).

Nicely testified that he was a civilian police officer for six or seven years and handled a K-9 during that time. He was then certified by United States Police Canine Association, and thought he "got some certifications from NAPWDA, North American Police Working Dog." (#52, 160:2-4). He recalled that he worked with five different dogs while he was a civilian police officer.

Mr. Nicely stopped working in law enforcement in 1986. In 1989, he began working for Global Training Academy, training police service dogs and handlers. He is not a certified judge or trainer with any organization and explained, "It's more of a club." (#52, 161:12). He testified he had trained "hundreds and hundreds and hundreds of dogs and handlers," and "probably 90 percent of them went to some form of law enforcement. The others went to some form of private security." (#52, 161:13-17). He stated that he had observed approximately 1,000 canines in drug detection work.

-15-

Nicely testified that he has developed knowledge or experience as it relates to how K-9s typically respond who have been appropriately trained to detect the odor of narcotics. According to Mr. Nicely,

> They exhibit – What the handler calls an alert is the technical definition Pavlov identified as to what is a reflex or the orienting response, and that's the initial. It's instinctual. They – Because they have no biological or psychological need to respond to drugs, we induce that through pairing it with a simple reinforcement. But the behavior that they exhibit is a natural behavior. And then it proceeds on.

(#152, 162:8-14). Each dog exhibits a very observable oriented response, although the dogs' exact behaviors may vary.

Mr. Nicely then described the process of teaching a dog to respond to the odor of narcotics:

> The process that I used started out with what's known behaviorally as pairing. You take the re-enforcer that you're going to use, you pair it with the intended target. You do that very briefly, because you don't want to get the dog totally on to just the target itself. You use short-term memory, but you do it very briefly. I usually pair five times in an open area. The sixth time I've got the drugs out by itself, and then when the dog shows its response, or its orienting response and goes to the odorant, it's reenforced. And then I start from there getting the dog on to the odorant. I'm not ready to teach the final response yet. Once the dog has learned to work the odorant to the source on its own without any influence from the handler, then I begin the final response or the operant response.

(#152, 162:22-163:11). It is important that the dog exhibit the alert behavior on its own "[s]o that the handler can ... basically let it work the odor." Part of the training is to "train the dogs so that it is obvious that the lay person could pick it out just right on it." It is important that the handler does not accidentally pull the dog off the odor and call the dog to stop responding. (#152, 163:14-21). In addition, the dog should learn to work on its own

-16-

without looking back at the handler. Whenever the dog looks at its handler, it is asking for assistance, and that leads to cuing. Cuing is bad because "it can cause false – it can cause the dog to respond to someone's items that has no drugs, and we end up searching them.... [A] response where nothing is produced ties up resources, invades people's privacy, lets drugs go down the road that could have been – It's just – It's a bad thing." (#57, 164:4-9). Nicely agreed with defense counsel that "cuing" could also lead to "situations where the dog relies instead of on its instincts to the handler identifying situations where they should alert – not alert but indicate." Nicely advised, "That's called prompt dependency," and he has seen it "probably in about every dog I've reviewed in the last couple years. I've seen it in the majority of them." (#57, 164:10-18).

Mr. Nicely testified he saw prompt dependency when he was using the concepts that were taught 30 years ago. As he learned more, he determined that the dog should be taught to go to the odor on its own without handler influence.

Turning to his prior testimony, Nicely advised that he testified once for the government in 1993 in a case involving 300 pounds of marijuana. He left the industry of producing K-9s for law enforcement agencies in June 2006 so that he could start his own business. Initially, Mr. Nicely went to Iraq to get enough funds to start his own business, and intended to do primarily behavioral modification on pet dogs. He testified that business was going very well, but then one Dr. Craig, an expert witness who had been doing quite a bit of testimony, called and asked Nicely to consider taking a case.

Mr. Nicely testified that he looks for the following characteristics in a dog that is appropriately trained to detect the odor of narcotics:

> The first thing that I look for in the dog is a dog that has the desire and the motivation to really learn. You will see that on the dog. His mouth is closed and sniffing about 90 plus percent of the time. He's pretty much independent. He'll go where the handler directs him, but if the handler is not directing him, he has such desire to search that he will do it on his own. And then I look for

the dogs that will function in all kinds of things, as far as the behavior – the natural behavior of the dogs.

(#57, 166:19-167:4).  Mr. Nicely referred to a video, the link to which was sent to him "a couple months ago" by a friend because the dog in the video looked like one of the dogs they had trained.  This video, eventually identified as defendant's Exhibit 103, was played during the hearing, but was not offered or received in evidence.  Nicely appeared to approve of the dog's performance as depicted in Exhibit 103 because the dog behaved as if Nicely himself had trained it.  (*See* #57, 169:1-20).

Nicely stated that he has declined some work offered by defense attorneys because there were not adequate records to review.  About 15 years ago, in Maryland, he attended the hearings, listened to the handler, and then refused to testify because the handler was so convincing.  He recalled only that the location of the case was in a state court somewhere north or northwest of Baltimore.  (*See* #57,  171:4-172:7; 216:16-25).

Nicely then declared Exhibit 103 to be a good demonstrative tool and praised the performance of two other dogs and a dog handler (whom he himself trained) depicted in Exhibit 103.  (#57, 172:13-174:25).

Turning to the case at bar, Mr. Nicely did review Exhibit 1 and heard the testimony of Officer Bossman.  He stated that Bossman's taking the dog around the car four times meant that dog's response was dependent upon the handler and not the odor; the dog was not "in charge." If the dog had detected the odor the first time, it would never have left the trunk area of the car.  According to Mr. Nicely, "It should have been clear as day, and certainly no more than – you know, he may have missed the first time because he wasn't properly trained, but when he got around the second time, it should have been over. The dog should have responded."  He theorized that every time a dog is led around a vehicle by its handler, the handler can get more frustrated and "[t]he dog can get more frustrated, especially when the

-18-

handlers have been given all this information and all these so-called indicators." Either the dogs, or the handlers, or both, get into the mindset that something is there; they perceive things that "may not be actually occurring" and the dog is induced "to respond by something other than the target odor." (#57, 172:6-17).

Having reviewed the government's video, Exhibit 1, Nicely testified that he could not see the "indication" behavior, i.e., the dog scratching at the vehicle. There was a sound and the dog was scratching when the handler stopped moving counterclockwise around the vehicle. Nicely perceived that the handler backing up probably induced the dog's scratching; he saw "nothing what they call as an alert or Pavlov would call the orienting or what-is-it reflex." (#57, 176:24-177:8). He saw no change in the dog that would be apparent to a layperson. (#57, 177:10).

Upon reviewing defendant's Exhibit 104 (which is a selected portion of the government's Exhibit 1), Nicely testified that the dog's scratching the vehicle as he jumps up indicated nothing "other than he's a high-energy dog." (#57, 178:9). He concluded that the dog had been cued by Officer Bossman stepping back. (#57, 178:20-179:3). Nicely also noticed that on a couple occasions, Skeen looked at Bossman instead of looking at the car, meaning that the dog sought guidance or input from Bossman. According to Nicely, if the dog caught the scent and looks at the handler, the dog is looking for guidance. The dog looking at the handler means, to Mr. Nicely, that the dog's response was not caused by an odorant but was caused by the handler, and if the handler does not perceive the substance to be there, the dog will not respond. (#57, 180:1-12).

Based on information that 534.9 grams of pure methamphetamine was located in the rear of the Cadillac, Mr. Nicely opined that Skeen did not exhibit any behaviors that were consistent of having detected any amount of odorant of interest. The amount of odorant could not be determined from the dog's response.

-19-

On cross-examination, Mr. Nicely acknowledged that he had not published any papers in the area of K-9 work, K-9 detection, or police service dogs since 1996. In any event, none of the papers he did publish were peer reviewed. Since opening his own business, he has testified for the defense in approximately 40 cases regarding the detection of odor by K-9s. On each of these occasions, Nicely concluded the dogs were unreliable. His current fees are $175 per hour for consultations and $300 per hour for testimony.

Mr. Nicely admitted that he has never been certified as a judge with any organization in the field of K-9 detection or K-9 police service dog work; he has always worked for private companies. Nicely characterized associations such as the International Congress of Police Service Dogs, North American Police Working Dog Association, National Narcotic Detector Dog Association, United States Police Canine Association, California Narcotic Detector Dog Association as "clubs."

Nicely clarified that he worked with single purpose and dual purpose dogs in the Marines from 1972 to 1979. In 1979, he went to work at the jail in Bexar County, Texas but did not work with a dog there. Nicely went to work for the Leon Valley Police Department, consisting of about 20 officers, in 1981. He worked with a service dog there, but the dog was not trained to detect the odor of narcotics. Mr. Nicely next worked for the Terrell Hills police department, consisting of about 15 officers, and worked with the same single purpose dog he had at the Leon Valley Police Department. Towards the end of his employment at Leon Valley, his dog was trained to detect the odor of narcotics.

Mr. Nicely did not work from 1986 to 1989. In 1989, he began working for Global Training Academy training dogs until 2006. He has not actually worked with or trained drug detector dogs since leaving Global in 2006. He does train pet dogs through his business "The Nicely Trained Dog." His police service dog consultations are done through his business "Canine Consultants of America." All of his "Canine Consultants" clients have been defense attorneys. He testified on redirect examination that he does do the best he can

-20-

to "keep up to date on the current or most current ideas and nuances and training techniques relating to K-9s." (#57, 218:7-9).

Mr. Nicely testified that he and the Nebraska State Patrol use "[o]perant conditioning, labeled by B.F. Skinner." (#57, 193:25). However, his methodologies for training and certifying K-9s differ from those of the Nebraska State Patrol. He prefers the methods of training and certification used by the U.S. Department of Defense, which he learned while in the military and used at the Global Training Academy. These methods differ from those of the International Congress of Police Service Dogs, which is the methodology used by the Nebraska State Patrol. Nicely believes that once the dog has detected or perceived to have detected the target odorant, the dog should be allowed to take the lead, as demonstrated in Exhibit 103. (#57, 217:9-15). Other unspecified organizations in Europe and the United States take this position. (#57, 217:16-218:6).

Mr. Nicely testified he did not agree Skeen was trained in accordance with the standards established by the International Congress of Police Service Dogs because more than five grams of substance was used in the training or certification process, contrary to the writings of Wendell Nope, the lead person of the International Congress in the United States. Other than that difference, though, he had to agree that Skeen was trained in accordance with the standards established by the International Congress. He was not aware of any studies comparing the accuracy of narcotics detector dogs trained using his own preferred methods versus the methods, standards and procedures used by the International Congress. Nicely stated that he does not endorse or agree with any method other than the method that he himself teaches.

The witness acknowledged it was possible for a dog to detect the odor of narcotics, yet not immediately indicate when it has located the strongest source of the odor; the first time a dog detects an odor, the dog may not be able to immediately tell whether that is the strongest source. An "orienting response" to an odor the dog is trained to detect could

-21-

include the dog turning its head or nose away from its direction of travel.  On redirect examination, however, he testified that a dog might turn its head in this manner for a number of other reasons.  (#57, 220:3-10).

Mr. Nicely believes it is improper to conduct more than one circuit of the exterior of a vehicle when doing exterior sniff; however, he agreed that his belief is not a standard or a rule applicable in Nebraska or Texas.

In this case, Nicely opined that Skeen's indication was not reliable and that Skeen had been cued by his handler.  He admitted, however, that Skeen did not indicate in some of the deployments recorded in Exhibit 5.  He also admitted that the video of Skeen demonstrated that the dog was motivated and sniffed through his nose with a closed mouth, positive behaviors which he considered to be important in a drug detection dog.  He had never observed Skeen prior to March 13, 2009.  Nor has he ever been present during a certification conducted by the Nebraska State Patrol or the Omaha Police Department.

### E.  Edward Joseph Van Buren (Government's Rebuttal Witness)

Edward Joseph Van Buren has been employed by the Douglas County Sheriff's Department for 24 years.  He is currently a K-9 Sergeant and trainer.  He testified as to his training as a police officer.

Sergeant Van Buren began handling drug detection dogs in 1994, with a single purpose drug detection dog.  His initial training in this area took place at a vending school, Rudy Drexler's School for Dogs in Elkhart, Indiana.  The training included care and maintenance of the dog, how to handle the dog, and how to and work the dog in different environments while conducting sniffs for illegal drugs.

In about 1996, the Sheriff's Department switched to the state certification system, and Sergeant Van Buren was certified by the State of Nebraska in 1996 as a detector dog handler.  To obtain state certification, Van Buren had to complete the certification course

conducted by the Nebraska State Patrol.  The course was similar to the certification process used today.  He has renewed his certification annually since 1996 and has worked with five service dogs.

Van Buren testified that he became an evaluator in 1998, meaning that he evaluated the performance of dogs and handlers during the state certification process.  During a narcotics detector dog certification, the evaluator sets up 10 scenarios and 14 finds.  The purpose of the evaluation is to determine whether the teams of dogs and handlers are reliable and properly trained for narcotics detection work.  To obtain certification as an evaluator, Van Buren attended a one-week training session with State Patrol Captain Mike Kirby at the law enforcement training center in Grand Island.  This session included classroom instruction, a research paper, and a written test.  The evaluator candidates had to accurately grade and evaluate canines in the field to the satisfaction of the teaching judge, Captain Mike Kirby.

Sergeant Van Buren completed the training and certification to be an instructor in the summer of 1999 by attending an 8 to 10 week course/camp for dogs and dog handlers conducted by the Nebraska State Patrol.  As an instructor candidate, Van Buren attended the camp and assisted the trainers and judges.  He had to take four 100-question tests, write research papers on patrol and narcotics dogs.  He also had to pass the test in the field, i.e., the day-to-day training with the new teams under the guidance of State Patrol Captain Mike Kirby.  Sergeant Van Buren now instructs K-9 handlers for the Douglas County Sheriff's Office and serves as an instructor for other agencies in Nebraska, Iowa, Colorado, Kansas and Texas.

Van Buren explained that an instructor trains dogs and handlers which may vary from completely untrained or "green" dogs and handlers to teams who have already been trained at some level.  The entire training process  involves five steps:  (1) odor memorization, (2) indication, (3) searching skills, (4) diversions, and (5) scenario based training.

An indication occurs when the canine goes into a final trained response after detecting the odor of drugs.

Diversions are distractions with intent.  For example, a distraction would be a naturally occurring object or substance that you may encounter while doing business.  A diversion is a type of distraction that is intentionally set, such as a drug smuggler packaging drugs with coffee grounds, mustard or grease.  Plastic bags and duct tape are items associated with drug detection and are placed in the search area to ensure the dog is indicating to the odor of drugs and not to something else that is associated with the drug odor.

Sergeant Van Buren described the certification process as being very realistic, covering a wide variety of areas – the exterior and interior of vehicles, dark rooms, barn stalls, bedrooms, bathrooms, kitchens, cellars, lockers, luggage, and the like.  Diversions are also employed.  The examiners try to cover every possible environment in each certification. The teams are then required to find where narcotics have been stashed hidden.  The dogs and handlers are graded on a scale of 1 to 6, with 1 being the best score.  (*See, e.g.*, the training records in Exhibit 4).  To pass the certification test, the team must average a 4.0 or better in searching and indication, along with handler skills.

As an evaluator, Van Buren has failed teams that did not score passing grades, including teams from his own agency.  He has also terminated certification testing when the dogs or handlers were obviously unqualified. For example, he stopped a certification near the beginning because it was obvious the team was not properly trained.  In another instance, certification was stopped because the handler lacked proper training, and the dog clearly lacked the drives and traits needed for drug detection.

Teams are certified for a period of one year, and it is recommended that the teams be recertified annually.  The process for recertification is the same as for the initial certification.

-24-

Maintenance training is also recommended.  His own agency generally conducts 8 hours per week of maintenance training.

Sergeant Van Buren testified he completed the requirements to be a Polizei-spuerhundpruefung or "PSP" judge for police detector dog examinations in March 2009. That program or methodology derives from the International Congress of Police Service Dogs.  To become a PSP judge, Van Buren had to work and train with Captain Mike Kirby on numerous occasions and complete a lengthy research paper which was examined by Captain Kirby.  Being a judge for PSP qualifies Van Buren to issue an international certification.  Only two other persons in the State of Nebraska are qualified as PSP judges.

Sergeant Van Buren has reviewed the government's Exhibits 1-5.  Training records such as those included in Exhibit 4 memorialize every time a handler trains with the dog. The handler documents the type of drug, the amount of the drug, where the drug was hidden, and any diversions or distractions that are placed in the area.  Deployment records such as those included in Exhibit 5 contain the location, date,  the situation, and what the team was asked to do.

Based on his review of the exhibits, in light of his training and experience, Sergeant Van Buren opined that Officer Bossman and his canine Skeen were properly certified as a narcotics detector dog team and were prepared to work the street as of March 13, 2009.  Van Buren noted that the training records did not show any "red flags" in terms of deployment. The records did show a lot of deployments where the dog had no alert or no indication, which is consistent with a dog that is well trained and is utilized on the street in these situations.  The certification form, Exhibit 2, shows that the team passed the necessary requirements to become certified as a detector dog team, and the certification was in effect as of March 13, 2009.

Van Buren further opined that Officer Bossman's report of Skeen's positive indication was reliable. Van Buren had watched the video (Exhibit 1) and observed the dog alert on the

rear of the vehicle on several occasions.  He also watched the dog alert and then go into an indication on the rear trunk seam.  "Alert" is when the dog is detecting a drug odor.  The handler wants the dog to try to pinpoint the strongest source of that odor, so the handler works the dog in the area or around the vehicle to try to determine the strongest source of the odor.  The "indication" is the dog's final response. An aggressive indication dog will indicate by scratching, biting, or barking. A passive indication dog will indicate by sitting, standing, or staring.

Van Buren agreed that Bossman and Skeen circled the Cadillac four times, alerting at the trunk area during different circuits of the vehicle.  There is no specific number of times a handler may present an area to a dog; it depends on the situation, the environment, weather, and the like.  (#58,45:2-3).  It is also possible for a dog to become frustrated if it is unable to pinpoint the strongest source of an odor.  (#58, 45:7).  A dog that is getting frustrated will start looking at the handler more frequently and you will hear very little if any sniffing. There will be no "intensity," and you will see the dog start looking at the handler or changing its behavior due to the handler's behavior.  In this case, however, the dog was sniffing and remained focused on the vehicle, working fairly fast.  (#58, 70:3-14).

If the handler sees the dog alerting to a certain area, the handler should try to detail that area by continuing to bring the dog around the vehicle or by turning the dog around and focusing on that particular area.  (#58, 70:22-71:3).

From his review of Exhibit 1, it appeared to Van Buren that the dog was working hard and fast.  The dog was being "very nasal" and you could hear the dog using its nose, which is what the dog is supposed to do.  A significant point in this particular vehicle sniff appears just prior to the indication; when the dog alerted at the left rear trunk area, he made a very quick but very obvious head snap to the left over to the trunk seam.  Van Buren observed that, as the handler kept moving away from the dog, the dog's head snapped away from the handler to the trunk seam, and the dog indicated by scratching.  This behavior is

-26-

a telltale sign that the dog pinpointed the strongest odor of the source of the drugs.  These events are recorded on Exhibit 1, segment 2 at 3:51 through 4:02.

Sergeant Van Buren was also of the opinion that Officer Bossman did not cue Skeen during the deployment on March 13, 2009.  The leash was loose, and the officer kept moving.  Even when the dog went up on the trunk, the officer kept moving away.  The head snap by the dog was away from the handler.  According to Van Buren, a dog that is being cued will look at the handler numerous times, or consistently, and react to the handler.  In this case, the handler kept moving, and the dog did not turn and look at the handler before the indication.  In any event, it is not strictly forbidden for a dog to look at its handler.

Recalling his observations of dogs that had actually been cued, Van Buren noted that the handler would stop or do something that the dog would see, and then the dog would go into an indication.  It is common for a dog to actually continue to look up or glance back at the handler when it is being cued.  In the present case, Skeen was completely focused on the vehicle at the time of indication.  Other behaviors indicative of cuing include the handler presenting the same location over and over again, the dog paying more attention to the handler than he is to the task at hand, and the handler stopping and standing over the dog. (#58, 43:17-25).

Skeen's position on the vehicle at the time of indication also indicated that he was not being cued.  Typically, a dog that is being cued or giving a false indication will normally do it down in a more comfortable situation.  Here, Skeen was up on the trunk, with his head snapped to the seam of the trunk, and then went right into an indication.  Skeen's behavior was a classic example of the dog pinpointing the strongest source of the odor and then going into the indication it was trained to do.  Skeen's prior alerts on the trunk area indicated to Van Buren that the dog obviously was picking up a drug odor but could not yet pinpoint the strongest source.

-27-

Skeen's deployment records also suggested that the indication was not cued. If a dog's deployment records reflect a lot of cases where the dog indicates but nothing is found, "you have to start wondering if that's not the case, something's not going on behind the scenes." Skeen's deployment records showed several deployments where there was no alert or indication, suggesting that the dog did not detect any odor of any drugs, and the dog was not being cued or falsely indicating.

On cross-examination, Sergeant Van Buren acknowledged that Officer Bossman should not have allowed Skeen inside the Cadillac. He had not discussed the matter with Bossman, and his testimony was based on his review of the video. In this regard, a handler is not necessarily the best person to evaluate whether an alert occurred; a handler may miss an alert under these conditions because the handler also has to watch where he is going and watch for other environmental issues.

Sergeant Van Buren testified on cross-examination that he does not deploy his own dog very frequently as a supervisor. Even as a handler, Van Buren may not deploy his dog for several months. The frequency of deployment would depend on the assignment, where the officer is working, if the officer has had any sick or vacation leave, and other factors.

## II. ISSUES PRESENTED

In his motion, as originally filed and briefed in May 2009[1] (*see* Filing 24), the defendant argued that all physical evidence and statements obtained as the result of the March 13, 2009 traffic stop should be suppressed because his Fourth Amendment rights were violated in the following ways:

- Officer Bossman did not have probable cause or reasonable suspicion to stop the defendant's vehicle,

- Officer Bossman unlawfully expanded the scope of the traffic stop,

---

[1]The motion to suppress was filed out of time, after the case had already been set for trial.

- Officer Bossman unlawfully detained the defendant past the time reasonably necessary to process a traffic violation, and
- Officer Bossman searched the defendant's vehicle without consent, probable cause or a warrant.

Most of this lengthy suppression hearing was devoted to probing the qualifications and performance of the service dog, Skeen; however, the defendant did not submit any written argument specifically linking this subject to the application of an exclusionary rule. On June 18, 2009, the date originally reserved for the suppression hearing, the court was informed that the defendant had retained an expert witness. After a status conference held July 19, 2009, the suppression hearing was scheduled for September 25, 2009. On September 17, however, the defendant filed a discovery motion (Filing 38) to compel the government to allow "testing/ examination of the performance of K9 Skeen and his handler Omaha Police Officer Bossman by the Defendant's K9 expert." The discovery motion, which was not separately briefed, does indicate that the defendant intended to challenge the dog's reliability, the validity of the dog's certification, and Officer Bossman's handling of the dog (specifically, cuing) during the dog's deployment in this case.[2] The defense expert did not provide any written report. In summary, the defendant's argument for suppression, which was not made until closing argument, appears to be that Officer Bossman lacked probable cause to search the Cadillac vehicle because (1) the dog was unreliable for various reasons arguably reflected in the evidence, and (2) Mr. Nicely opined that the dog did not indicate on the defendant's car.

---

[2]The discovery motion was denied (*see* Filing 43) because, even assuming the court had the authority to grant the motion, the dog had been retired as a police service dog, was no longer owned by the city of Omaha, and was no longer trained to work as a police service dog. Consequently, a current evaluation would be of no evidentiary value in determining whether the dog was reliable and certified on the date of the search.

## III.  LEGAL ANALYSIS

### A.  Initial Stop of the Cadillac

Officer Bossman testified that he was asked by the DEA agents to follow the Cadillac vehicle and stop it if he observed a traffic violation.  He stopped the Cadillac for a license plate display violation and because the rear and side windows of the Cadillac were heavily tinted, causing his ability to see into the Cadillac to be substantially impaired.  These are traffic violations.  *See* Neb. Rev. Stat. §§ 60-399(2) & 60-6,257(1)(a).

An officer's decision to stop an automobile is reasonable if the officer has probable cause to believe that a traffic violation has occurred.  Any traffic violation, however minor, provides probable cause for a traffic stop.  *United States v. Adler*, — F.3d — , 2009 WL 5150265, Case No. 09-1775 (8th Cir., Dec. 31, 2009).  Once an officer has probable cause, a traffic stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant.  Nor is it relevant that the officer may have ignored the violation "were it not for 'a suspicion that greater crimes are afoot.'"  *United States v. Arciniega*, 569 F.3d 394, 397 (8th Cir. 2009).  "An otherwise constitutional traffic stop is not invalidated by the fact that it was 'mere pretext for a narcotics search.'"  *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (quoting *United States v. Williams,* 429 F.3d 767, 771 (8th Cir. 2005)).

Considering the testimony of Officer Bossman, which I find to be credible, I find that the officer had probable cause to stop the vehicle for traffic violations.

### B.  Duration of the Traffic Stop

The legal standards for conducting a traffic stop were summarized by the Eighth Circuit in *United States v. Suitt*, 569 F.3d 867, 870-71 (8th Cir.), *cert. denied*, 130 S.Ct. 521 (2009):

> "The Supreme Court has analogized roadside questioning during a traffic stop to a *Terry* stop, which allows an officer with reasonable suspicion to

detain an individual in order to ask '[a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." [*United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008)] (quoting [*Illinois v. Caballes*, 543 U.S. 405, 407 (2005)]). "During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *Id.* (quotation omitted). "A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quotation omitted). "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops." [*United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007)]. "When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine." Id. "'Reasonableness ... is measured in objective terms by examining the totality of the circumstances.'" *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

(Parallel citations omitted).

An officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *See, e.g., United States v. Poulack*, 236 F.3d 932, 935-36 (8th Cir.), *cert. denied*, 534 U.S. 864 (2001)). Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *Id.*

Here, Officer Bossman conducted permissible routine inquiries through translation by the passenger, Ricardo.   The defendant was issued a citation for failing to produce a valid driver's license.  While seated in the police cruiser, the defendant signed the citation,

-31-

and Bossman returned his documents to him.  It was then determined that Ricardo, who had a valid driver's license, could drive the vehicle.  The defendant denied Officer Bossman's request for permission to search the Cadillac.  Bossman then detained the vehicle and its occupants so he could use his narcotics detection dog to sniff the exterior of the vehicle.

The issue presented at this point is whether Officer Bossman had developed a reasonable, articulable suspicion of criminal activity during the traffic stop, so as to justify detaining the defendant for further investigation.  The court finds that he did.

During the traffic stop, Bossman noted the defendant's use of a third-party vehicle. The owner of the vehicle was not present, and the occupants did not know the name of the owner.  The defendant continued to appear extremely nervous, even after he was only issued a traffic citation.  Ricardo's stated travel plans, involving lengthy bus trips to and from California for a two-day visit with "family," were not plausible, and Ricardo's behavior in responding to questions was consistent with the use of stall tactics.

The court finds that Officer Bossman did develop a reasonable, articulable suspicion of criminal activity during the traffic stop, and the traffic stop was not unlawfully expanded.

### C. Probable Cause to Search

In this case, the United States relies on the positive indication by canine Skeen to establish probable cause to search the Cadillac.

> Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." [*Illinois v. Gates*, 462 U.S. 213, 238 (1983).] Determining whether probable cause exists at the time of the search is a "commonsense, practical question" to be judged from the "totality-of-the-circumstances. *Id.* at 230. "Probable cause ... does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001) (quoting *United States v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000)); *see also United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006) (pointing out that reasonable

-32-

suspicion has a lower threshold than probable cause and a considerably lower threshold than preponderance of the evidence); *Gates*, 462 U.S. at 244 n.13.

*United States v. Donnelly*, 475 F.3d 946, 954-55 (8th Cir.), *cert. denied*, 551 U.S. 1123 (2007) (parallel citations omitted).  It remains the law in this jurisdiction that a positive alert by a reliable drug detection dog constitutes proof of probable cause.

> Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present.  *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir. 1999).  In finding sufficient the affidavit at issue in *Sundby*, we declared that "[in order to establish the dog's reliability,] the affidavit need only state the dog has been trained and certified to detect drugs.... An affidavit need not give a detailed account of the dog's track record or education."  *Id.* at 876 (citations omitted).  Such statements only establish the affidavit's facial validity, however.  *Id.* (holding that the defendant would have been entitled to a *Franks* hearing had he shown that officers withheld negative information casting into doubt the dog's reliability).

*Id.* at 955.

In general, dog sniffs of the exterior of a vehicle are not searches under the Fourth Amendment.  *See, e.g., United States v. Suitt*, 569 F.3d at 870.  In this case, however, Officer Bossman testified that he opened the passenger side doors so the passengers could get out of the car.  He then closed the back passenger door but, inexplicably, left the front passenger door open and during the second pass, actually instructed the dog to jump into the vehicle.  Plaintiff's counsel, Officer Bossman, and Sergeant Van Buren all agree and concede that Bossman should have shut the car door and should not have allowed Skeen inside the vehicle because he did not have permission to do so.

This sorry circumstance is more serious than the conduct challenged in *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007), a case originating in Nebraska, where the service dog stuck his head through an open passenger-side window and immediately indicated at the passenger-side door.  In *Lyons*, however, an occupant of the vehicle had opened the window

-33-

and left it open on his own volition, not at the order or request of law enforcement.  Nor did the handler in *Lyons* direct the dog to stick his head through the window.  486 F.3d at 373.

I conclude that Officer Bossman did violate the defendant's Fourth Amendment rights by affirmatively opening the passenger door, deliberately leaving the door open, and then directing or allowing his service dog to enter the defendant's vehicle when he did not have permission to do so.

Although this conduct constituted an unreasonable search, "[t]he fact that a Fourth Amendment violation occurred – i.e., that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies."  *Herring v. United States*, 129 S. Ct. 695, 700-701 (2009).  In *Herring*, a 5-4 decision, the Chief Justice wrote:

> [E]xclusion "has always been our last resort, not our first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and our precedents establish important principles that constrain application of the exclusionary rule.
>
> First, the exclusionary rule is not an individual right and applies only where it "'result[s] in appreciable deterrence.'" [*United States v. Leon*, 468 U.S. 897, 909 (1984)] (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).  We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. *Leon, supra*, at 905-906; [*Arizona v. Evans*, 514 U.S. 1, 13-14 (1995)]; *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998).  Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future. *See* [*United States v. Calandra*, 414 U.S. 338, 347-355, (1974)]; *Stone v. Powell*, 428 U.S. 465, 486 (1976).
>
> In addition, the benefits of deterrence must outweigh the costs. *Leon, supra*, at 910.  "We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Scott, supra*, at 368.  "[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs." *Illinois v. Krull*, 480 U.S. 340, 352-353 (1987) (internal quotation marks omitted). The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free–something that "offends basic concepts of the criminal justice system." *Leon, supra*, at 908. "[T]he rule's costly toll upon

-34-

truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Scott, supra*, at 364-365 (internal quotation marks omitted); *see also United States v. Havens*, 446 U.S. 620, 626-627 (1980); *United States v. Payner*, 447 U.S. 727, 734 (1980).

(Parallel citations and footnote omitted). The Chief Justice concluded,

To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring v. United States*, 129 S. Ct. at 702. The majority opinion in *Herring* emphasizes the Court's precedents holding that the exclusionary rule should be applied only "'where a Fourth Amendment violation has been substantial and deliberate.'" *United States v. Leon*, 468 U.S. 897, 909 (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

The decision whether or not to exclude evidence thus appears to depend on whether Officer Bossman's admitted mistake constituted a "substantial and deliberate" violation of the defendant's rights under the Fourth Amendment. I conclude that it did not.

In reaching this conclusion, I have reviewed the video recording of the traffic stop and have carefully considered the testimony and demeanor of Officer Bossman and Sergeant Van Buren. Officer Bossman's testified:

Q. How did it come about that that door was open?

A. I left it open when I had the passengers get out.

Q. Was one of the doors, did you close it after the passenger got out?

        ....

There's two doors on that right side of the vehicle?

A. Right.

Q. Did you close one of them?

-35-

A. Yes.

Q. But not the second?

A. I closed the rear passenger door, not the first. I was watching both people as they got out, took my hand off the front door, had the rear door open and that passenger step[ped] out and then pushed that one shut. And I stepped away from the front one and never shut it.

Q. Okay. Was there any reason in particular why you didn't shut that front one?

A. No, ... Nothing in particular. I had stepped away from it because the back door was opening. Again, I was watching the two people and the other two making sure they go over towards my partner to be watched, and I just didn't shut it.

(#52, 85:7-86:3).   He candidly admitted on cross-examination that he did not have permission to search and should not have allowed the dog inside the car.

The video (Exhibit 1) demonstrates that Bossman did not treat the open front door any differently than the exterior of the car as he walked Skeen around the Cadillac. Notwithstanding Mr. Nicely's opinion to the contrary, Officer Bossman and Sergeant Van Buren testified credibly that Skeen consistently displayed alert behavior on the exterior, both before and after he was allowed inside the vehicle.[3]   Skeen was trained to indicate at the strongest source of the odor, and did so while outside the car.

The Eighth Circuit has held that "[o]nly if the constitutional violation was 'at least a but-for cause of obtaining the evidence' is suppression of evidence the appropriate remedy." *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008) (citations omitted).   I am

---

[3]I have given little weight to Mr. Nicely's conclusions about Skeen's performance and reliability because, based on the information actually provided in his *curriculum vitae* and testimony, I am not persuaded that Mr. Nicely has the knowledge, skill, experience, training, or education to evaluate a dog trained to perform the functions required by law enforcement in the State of Nebraska.  *See* Fed. R. Evid. 702.  The gist of his testimony was only that Skeen's performance was deficient or unreliable under competing standards and methods used by the military and commercial vendors to train dogs for other purposes.  I specifically reject Mr. Nicely's opinions that Skeen's behavior was cued by Officer Bossman and that Skeen did not indicate to the odor of an illegal drug.

persuaded that Skeen would have indicated at the exterior of the Cadillac even if he had not been allowed inside the vehicle. The dog's entry into the vehicle was not essential to the outcome of the canine sniff search.

Under these circumstances, suppression of evidence is not a proper sanction for Officer Bossman's briefly allowing the service dog inside the defendant's vehicle. While the court disapproves of Bossman's lapse or carelessness in this case, it does not appear that his conduct was "sufficiently deliberate that exclusion can meaningfully deter it," or "sufficiently culpable that such deterrence is worth the price paid by the justice system." See *Herring v. United States*, 129 S. Ct. at 702.

## IV.  RECOMMENDATION

**IT IS RECOMMENDED** that the defendant's motion to suppress evidence (Doc. 23) be denied in all respects.

A party may object to the magistrate judge's findings and recommendation by filing an "Objection to Magistrate Judge's Findings and Recommendation" within 14 days after being served with the findings and recommendation. The objecting party must comply with all requirements of NECrimR 59.2.

**DATED January 21, 2010.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-37-